IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIAM LAWSON, JOE TRIPODI,
THOMAS WHITTINGTON, JASON
PHILLIPS, AND NESBIT B.
("BRAD") SILLS, Individually
and On Behalf of All Others
Similarly Situated,

        Plaintiffs,

v.

BELL SOUTH TELECOMMUNICATIONS,
INC., d/b/a AT&T SOUTHEAST
a.k.a. AT&T ALABAMA/AT&T
FLORIDA/AT&T GEORGIA/AT&T
KENTUCKY/AT&T LOUISIANA/AT&T
MISSISSIPPI/AT&T NORTH
CAROLINA/AT&T SOUTH
CAROLINA/AT&T TENNESSEE,

        Defendant.

CIVIL ACTION NO.
1:09-CV-3528-JEC

**ORDER and OPINION**

    Plaintiffs seek conditional certification of a collective action on behalf of themselves and other similarly situated employees of defendant BellSouth Telecommunications, Inc. ("BellSouth"), in order to recover unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2006). For the reasons discussed herein, the Court **GRANTS** Plaintiffs' Motion for Conditional Collective Action Certification and Issuance of

Notice to the Collective Action Class [27], but **AMENDS** the proposed notice.

## BACKGROUND

The five named and thirty-eight opt-in plaintiffs are current and former "Field Managers" employed by BellSouth. (Pls.' Memo. of Law in Support of Mot. for Conditional Collective Action Certification and Issuance of Notice to the Collective Action Class ("Pls.' Memo.") [27-1] at 1.) They officially hold the title of Level One (or First Level) Managers, but they are also known as Field Managers because they work with field technicians who install and service BellSouth's cables. (*Id.* at 5.)

According to plaintiffs, Field Managers typically work between 50 to 70 hours a week. (*Id.* at 6.) Part of these long hours stem from "duty shift" every few weeks, which requires Field Managers to be on call 24 hours a day for seven days. (*Id.* at 7.) During duty shift, Field Managers must respond to calls and emails after hours, may not drink alcohol, and cannot leave their territories. (*Id.* at 7-8.) Plaintiffs allege that prior to September 2007, Field Managers received overtime wages for duty shift work and for some hours worked in excess of 40 hours a week. (*Id.* at 8.) Plaintiffs contend that BellSouth nevertheless unlawfully denied Field Managers overtime pay for several hours of "off-the-clock" work each day. (*Id.*)

2

In September 2007, after AT&T purchased BellSouth,[1] plaintiffs assert that BellSouth ceased paying Field Managers any overtime wages on the ground that Field Managers fall within the executive and administrative exemptions to the FLSA's overtime requirements. (*Id.* at 2.)  Plaintiffs argue they have been misclassified as exempt because they are really "low-level clerks" who perform little, if any, managerial duties.  (*Id.* at 2-3, 8-9.)  Specifically, plaintiffs allege that Field Managers cannot hire, fire, or promote technicians; they do not set technicians' wages or schedules; they do little training of technicians; they have almost no authority to discipline technicians; they do not determine technician assignments; and they do not advise technicians when a problem arises in the field.  (*Id.* at 9-12.)  Although Field Managers perform required quality and safety inspections of the technicians, the inspections involve a standardized yes/no checklist of basic questions, such as whether a technician is wearing a hard hat or is strapped into a telephone pole.  (*Id.* at 12.)  The bulk of their day is spent doing paperwork and entering computer data.  (*Id.* at 13.)  Plaintiffs further allege their work is highly regimented,

_____

[1] BellSouth's parent company, BellSouth Corporation, became a wholly-owned subsidiary of AT&T Inc. following a merger effective December 29, 2006.  (Def's. Mem. in Opp. to Pls.' Mot. for Conditional Collective Action Certification ("Def's. Mem.") [80-1] at 4 n.2.)

AO 72A
(Rev.8/82)

micromanaged, and lacks true managerial authority. (*Id.* at 13-14.)

Plaintiffs seek to conditionally certify a FLSA collective class comprised of "All Field Managers employed by BellSouth from December 2006 and thereafter." (*Id.* at 6.) Plaintiffs' proposed class is comprised of two subclasses:

> Subclass A: All Field Managers employed by BellSouth from December 2006 and thereafter who were classified by the company as non-exempt employees under the FLSA.
>
> Subclass B: All Field Managers employed by BellSouth from December 2006 and thereafter who were classified as exempt employees under the FLSA.

(*Id.* at 6-7.) Subclass A covers Field Managers who were allegedly denied overtime pay for "off-the-clock" work, even though they were classified as non-exempt prior to AT&T's takeover. (*Id.* at 24.) Subclass B covers Field Managers who were allegedly misclassified as exempt employees once AT&T purchased BellSouth and denied them overtime wages. (*Id.*)

In addition, plaintiffs request the Court to order BellSouth to provide plaintiffs with the names and contact information for all members of the collective classes and to authorize their proposed Notice of Court Certification of Collective Action. (*Id.*)

4

## DISCUSSION

I.   **FLSA Requirements**

    A.   **Overtime Wage Provisions**

The FLSA requires that employers pay employees one and a half times the regular rate for hours worked in excess of forty hours a week. 29 U.S.C. § 207(a)(1). This overtime provision exempts "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1).

The executive exemption applies if: (1) the employee's salary is $455 or more per week; (2) the employee's primary duty is management; (3) the employee customarily and regularly directs the work of two or more other employees; and (4) the employee has the authority to hire or fire other employees, or whose opinion is given particular weight in the hiring, firing, or promotion of other employees. 29 C.F.R. § 541.100(a)(2010). Although an exempt employee may perform both exempt and non-exempt work, an "employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive." *Id.* § 541.106(a). Administrative employees are subject to the same salary requirement as executive employees, and their primary duty must also directly relate to management or general business operations. *Id.* § 541.200(a). Additionally, their primary duty must include "the exercise of discretion and independent judgment

5

with respect to matters of significance." *Id.* For instance, an administrative employee may have the authority to formulate or influence management policies, or the authority to negotiate and bind the employer on important matters. *Id.* § 541.202(b). An employee may be considered to have discretion and independent judgment even though the employee's decisions are subject to review, or even reversal. *Id.* § 541.202(c).

The Department of Labor regulations define "primary duty" as the "principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). In general, an employee who spends more than 50% of his time performing exempt work will satisfy the primary duty requirement. *Id.* § 541.700(b). Time is only one factor, however. *Id.* Other considerations include "the relative importance of the exempt duties as compared with other types of duties" and "the employee's relative freedom from direct supervision." *Id.* § 541.700(a). Overall, the "character of the employee's job as a whole" matters the most. *Id.*

**B.  Collective Action Requirements**

An employee may sue an employer on behalf of himself and other "similarly situated" employees for violating the FLSA's overtime requirements. 29 U.S.C. § 216(b). To determine whether a collective action is warranted pursuant to § 216(b), a district court may follow a two-stage process. *Morgan v. Family Dollar*

6

*Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008) (noting that the Eleventh Circuit has sanctioned, but not required, two-step procedure).   First, a district court evaluates "whether other similarly situated employees should be notified." *Id.*   If so, then the court conditionally certifies the collective action and provides notice to putative class members. *Id.* at 1260-61.   The notice stage is important because a similarly situated employee can only join the collective action by filing written consent with the court. *See id.* at 1258-59; 29 U.S.C. § 216(b).

At this initial stage, a plaintiff must show "a reasonable basis for his claim that there are other similarly situated employees." *Morgan*, 551 F.3d at 1260 (quotation marks and citation omitted).   The plaintiff's burden is "not heavy" and "courts apply a fairly lenient standard" in assessing similarity. *Id.* at 1261 (quotation marks and citations omitted).   The similarity required at this step is even less stringent than the requirements for joinder under Rule 20(a), for separate trials under Rule 42(b), or for class certification under Rule 23(b)(3). *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996).   Plaintiffs may satisfy their burden through "detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Id.* at 1097 (quotation marks and citation omitted).   Further, because minimal discovery may have occurred at the notice stage, the

7

district court's decision may sometimes be based solely on the plaintiffs' pleadings and affidavits. *Morgan,* 551 F.3d at 1262 n.41; *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (noting with approval that a district court's decision at the notice stage is "usually based only on the pleadings and any affidavits which have been submitted"); see *also Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007) (district court certified a collective action at the first stage based primarily on the named plaintiffs' detailed allegations, which were supported in part by the employers' admissions and other documentary evidence).

The second stage imposes a greater burden on the plaintiff to prove similarity. *See Morgan*, 551 F.3d at 1261. When discovery is over or nearly complete, the employer may file a motion for decertification. *Id.* "[I]n order to overcome the defendant's evidence, a plaintiff must rely on more than just allegations and affidavits." *Id.* (quotation marks and citation omitted). The court then reassesses its initial certification decision based on a more comprehensive factual record. *Id.*

The Eleventh Circuit has explored the contours of the phrase "similarly situated" without imposing a precise definition. *See id.* at 1259. To warrant conditional certification in the first stage, a court "should satisfy itself that there are other employees . . . who desire to 'opt-in' and who are 'similarly' situated with respect

8

to their job requirements and with regard to their pay provisions."
*Id.* (citing *Dybach v. State of Fla. Dep't of Corrs.*, 942 F.2d 1562,
1567-68 (11th Cir. 1991)).  At the second stage, though, it is no
longer enough that the putative class members share similar job
duties and pay provisions.  *See id.* at 1262.  The court should
consider other factors as well, including the similarity of the
plaintiffs' factual and employment settings, whether the same
defenses will apply to each plaintiff, and any fairness and
procedural considerations associated with a collective action.  *Id.*
at 1261.  It is important to remember that at either stage,
employees may be considered similarly situated without having
identical positions.  *Id.* at 1260; *Anderson*, 488 F.3d at 953
(reiterating that "the FLSA does not require potential class members
to hold identical positions").  The similarly situated requirement
may also be satisfied without evidence of a "unified policy, plan,
or scheme of discrimination."  *Hipp*, 252 F.3d at 1219 (quotation
marks and citation omitted).  Ultimately, the issue of whether
employees are similarly situated hinges on the specific facts of the
case.  *See Morgan*, 551 F.3d at 1262 ("[W]hether a collective action
is appropriate depends largely on the factual question of whether
the plaintiff employees are similarly situated to one another.")

AO 72A
(Rev.8/82)

## II. Analysis

Given that limited discovery has occurred in this case, the Court will apply the more lenient standards of the notice stage. Plaintiffs are entitled to conditional certification of a collective action if they can show there are other employees: (1) who wish to opt-in and (2) who are similarly situated in their job requirements and pay provisions. *Id.* at 1259. Plaintiffs easily meet the first requirement as thirty-eight BellSouth Field Managers have filed written consents to opt-in to this action.[2] It is also undisputed that BellSouth classifies Field Managers as exempt from overtime pay.[3] Thus, the key contested issue is whether the putative class members share similar job requirements.

The Court finds that plaintiffs have satisfied their initial burden to show there are other BellSouth employees with similar job requirements. According to William McKinney, AT&T's Director of Quality Management Systems, Field Managers are expected to perform

_____

[2] Three additional employees (Fred Monks, Melinda Taggart, and William A. Barry, Jr.) have revoked their original consent to join in the action. (Notices of Filing Revocation of Consent to Join [59-1, 82-1].)

[3] The parties do disagree, however, as to when Field Managers were first classified as exempt. Plaintiffs allege that they were only classified as exempt after BellSouth merged with AT&T, whereas BellSouth asserts that Field Managers have always been classified as exempt. (Pls.' Mem. [27-1] at 2; Def's Mem. [80-1] at 5 n.4.)

10

the same responsibilities no matter what state or business organization they work in:

> The company wanted to make sure that the operations were consistent across all of the geographic regions and the responsibilities of a first level manager should be consistent among all of the different operating areas, and so, when you think about what they do or what they should be doing, there shouldn't be significant differences between the way we operate in California and the way we operate in SNET, in the Connecticut area.

(McKinney Dep. [87-3] at 35:5-14).  To achieve this unity, all Field Managers must follow a particular management system called Management System & Operating Control ("MSOC").  (*Id.* at 44:2-10.)

The MSOC dictates a daily routine, with "the same elements," for all Field Managers.  (*Id.* at 103:13-24.)  According to Field Manager Albert Borchetta, "[M]y day is dictated by a guide called 'Day in the Life.'"  (Borchetta Decl. [27-15] at ¶ 25.)  This document, distributed by upper management, "lays out what Level One Managers should be doing at all times throughout the day."  (*Id.)* As a result, many of the Field Managers characterize their positions as "highly regimented" and "micromanaged." (Lawson Decl. [27-5] at ¶ 10; Whittington Decl. [27-7] at ¶ 10; Phillips Decl. [27-8] at ¶ 10; Hill Decl. [27-14] at ¶ 14; Ollayos Decl. [27-18] at ¶ 9; Arnold Decl. [87-12] at ¶ 11; McWhirter Decl. [87-15] at ¶ 10.)

Pursuant to MSOC, Field Managers begin each day by printing out and posting the technicians' performance reports.  (*See, e.g.,*

11

Lawson Decl. [27-5] at ¶ 16; Tripodi Decl. [27-6] at ¶ 15; Ollayos [27-18] at ¶ 11.)  Field Managers are not involved in compiling this data.  (Ollayos [27-18] at ¶ 11.)  Once the technicians arrive, Field Managers hold a short "tailgate" meeting or "huddle" to relay company messages and distribute assignments.  (*See, e.g.*, Lawson Decl. [27-5] at ¶ 17; Coffman Decl. [27-12] at ¶¶ 16-17; Benson Decl. [27-13] at ¶ 14; Hill Decl. [27-14] at 17.)  Field Managers are required to read verbatim any documents sent to them by upper management, such as safety directives or new company policies. (*See, e.g.*, Lawson Decl. [27-5] at ¶ 17; Tripodi Decl. [27-6] at ¶ 17; Morris Decl. [27-16] at ¶ 16; Baker Decl. [27-17] at ¶ 14.)

      After the technicians leave for their assignments, the plaintiffs' declarations indicate that Field Managers spend a majority of their time performing a variety of clerical tasks, including answering company e-mails, documenting their technicians' work, filling out reports, collecting timesheets, and doing other paperwork.  (*See, e.g.*, Lawson Decl. [27-5] at ¶¶ 10, 19; Tripodi Decl. [27-6] at ¶¶ 19-20, 22; Sills Decl. [27-9] at ¶ 16; Borchetta Decl. [27-15] at ¶¶ 15, 17; Morris Decl. [27-16] at ¶¶ 9, 17.) Several declarants described this work as "routine" and "repetitive." (*See, e.g.*, Lawson Decl. [27-5] at ¶ 11; Whittington Decl. [27-7] at ¶ 16; Coffman Decl. [27-12] at ¶ 19; Baker Decl. [27-17] at ¶ 18.)

Thomas Whittington explained that these clerical duties were "extremely time-consuming" because "[e]very interaction that we had needed to be documented, entered into the computer system, and forwarded to the appropriate contacts." (Whittington Decl. [27-7] at ¶ 18.)  Jerry Hill estimated that approximately 90% of his job is devoted to clerical work.  (Hill Decl. [27-14] at ¶ 19.)

A major duty shared by Field Managers is to pass information between the company and the field technicians.  (*See, e.g.*, Lawson Decl. [27-5] at ¶ 3; Sills Decl. [27-9] at ¶ 11; Coffman Decl. [27-12] at ¶ 9.)  Joseph Tripodi characterizes himself "as a messenger between technicians and other departments."  (Tripodi Decl. [27-6] at ¶ 23.)  If a technician has a payroll problem, for instance, the Field Manager relays the problem to the payroll department and then reports the department's response back to the technician.  (*Id.*)  Similarly, when a problem occurs in the field, Field Managers serve as middlemen between technicians and the engineers who designed the job.  (Sills Decl. [27-9] at ¶ 17.)

All Field Managers must also monitor their technicians' performance through periodic safety and quality inspections at the job site.  (*See, e.g.*, Coffman Decl. [27-12] at ¶ 30; Benson Decl. [27-13] at ¶ 24; Borchetta Decl. [27-15] at ¶ 34.)  Company policy requires Field Managers to use a standard inspection checklist consisting of basic "yes" or "no" questions.  (*See, e.g.*, Ollayos

13

Decl. [27-18] at ¶ 24 ("I made simple observations and checked off "yes" or "no" as to whether a technician was complying with a particular item on the checklist."); Story Decl. [27-20] at ¶ 21 ("I exercise minimal discretion or judgment in carrying out these inspections.").)   For example, during safety inspections, Field Managers ascertain that technicians are wearing the proper safety gear or have parked correctly. (Borchetta Decl. [27-15] at ¶ 34.) For quality inspections, Field Managers confirm that the job has been successfully completed and the customer is satisfied. (*Id.*)

Plaintiffs' declarations also support their allegations that they have limited authority and discretion in supervising their technicians.   Field Managers cannot hire, fire, or promote technicians. (*See, e.g.*, Lawson Decl. [27-5] at ¶¶ 27-28; Tripodi Decl. [27-6] at ¶¶ 27-29; Whittington Decl. [27-7] at ¶¶ 24-25; Pesaro Decl. [27-19] at ¶¶ 27-30.) Nor do they have much input into the decision-making process. (*See, e.g.*, Morris Decl. [27-16] at ¶ 26 (Field Manager documented technician's substance abuse problem but played no role in termination decision); Benson Decl. [27-13] at ¶ 30 (Field Manager collected information about a technician who picked up a 13-year-old girl in a company vehicle, but had no input in termination decision).) Similarly, any major disciplinary decisions are generally made by the Field Managers' superiors. (*See, e.g.*, Sills Decl. [27-9] at ¶ 25 ("If discipline was needed,

14

my supervisors would make the determination and my only role was to communicate the decision to the technician."); Baker Decl. [27-17] at ¶ 26 (Level Two Manager chose not to discipline technician who repeatedly called in sick and did inadequate work, despite Field Manager's opinion that technician should be terminated).)

The Field Managers' authority over the technicians is circumscribed in other ways. They have limited authority to approve overtime hours for technicians. (*See, e.g.*, Phillips Decl. [27-8] at ¶ 25; Coffman Decl. [27-12] at ¶¶ 25-26; Hill Decl. [27-14] at ¶ 28.) Field Managers lack authority to grant or deny vacation or personal days. (*See, e.g.*, Lawson Decl. [27-5] at ¶ 24; Baker Decl. [27-17] at ¶ 21; Pesaro Decl. [27-19] at ¶ 22.) Field Managers have only limited authority to purchase supplies for technicians. (*See, e.g.*, Ollayos Decl. [27-18] at ¶ 28 (required area manager's permission); Story Decl. [27-20] at ¶ 23 (limited authority).) Finally, Field Managers provide little training to technicians, who are primarily trained at the company's training center or through online computer programs. (*See, e.g.*, Sills Decl. [27-9] at ¶ 33; Baker Decl. [27-17] at ¶ 29; Pesaro Decl. [27-19] at ¶ 32.)

BellSouth's arguments that the putative class members are not similarly situated are unconvincing. BellSouth emphasizes that its operations span nine states and are divided into three business

15

organizations.[4]  In particular, BellSouth argues that Field Managers in the U-verse organization have different duties because their technicians are less experienced and not unionized.  Differences in individual factual and employment settings are generally a consideration for the second stage when discovery is complete and the Court has more information to evaluate.  *See Morgan*, 551 F.3d at 1261.

Even when such factors are considered, though, they are not dispositive.  The plaintiffs in *Hipp* and *Grayson* worked in various locations but still satisfied the similarly-situated requirement.  *See Hipp*, 252 F.3d at 1219 (fact that plaintiffs worked in different geographical locations was "not conclusive"); *Grayson*, 79 F.3d at 1091 (plaintiffs qualified for collective action despite employer's operation in 18 states).  Indeed, Family Dollar operated more than 6,000 stores in 40 states, plus the District of Columbia, and was organized into five divisions, 22 regions, and 380 districts.  *See Morgan*, 551 F.3d at 1248.  The district court certified a collective action class of 1,424 store managers, despite Family Dollar's contention that their duties varied according to the store's size,

---

[4] BellSouth operates in Georgia, Florida, Alabama, Mississipi, Louisiana, Tennessee, Kentucky, North Carolina, and South Carolina. (Def's. Mem. [80-1] at 4 n.3.)  The three business organizations are Installation & Maintenance (I&M), Construction & Engineering (C&E), and U-verse (which handles BellSouth's internet television service). (*Id.* at 5, 9).

sales volume, region, and district.  *Id.* at 1239, 1263.  The Eleventh Circuit affirmed the certification, noting that Family Dollar's uniform exemption of all store managers from overtime pay reflected that "even Family Dollar perceived no such distinction." *Id.* at 1263.

The same holds true here.  Despite BellSouth's assertions that Field Managers perform different duties depending on their business organization, BellSouth unilaterally exempts all Field Managers in every organization from overtime pay.  Furthermore, even upper management has admitted that Field Managers nationwide have the same "responsibilities" regardless of their operating area.  (McKinney Dep. [87-3] at 35:5-14.)  Stewart McElhannon, Director of Work Measurements, also conceded that U-verse Level One Managers have reasonably similar job duties to other Level Ones.  (McElhannon Dep. [87-4] at 184:13-17.)  These statements are confirmed by several of Plaintiffs' declarations, which affirm that all Level One Managers, including those in the U-verse organization, share similar job duties.  (*See, e.g.*, Arnold Decl. [87-12] at ¶ 13; Brannan Decl. [87-14] at ¶ 12; McWhirter Decl. [87-15] at ¶ 12 ; Munna Decl. [87-16] at ¶ 12.)

It is true that the Field Managers' declarations submitted by BellSouth at times contradict plaintiffs' declarations as to their

17

work experiences.[5] For instance, BellSouth's declarations state that Field Managers sometimes order supplies, grant vacation days, approve overtime, and discipline technicians without approval. (*See, e.g.*, Macolly Decl. [64-1] at ¶ 10 (U-verse Field Manager can purchase supplies under $2000 without authorization); Boyette Decl. [64-1] at ¶ 22 (C&E Field Manager can approve tool purchases up to $500); Natterman Decl. [64-1] at ¶ 5 (U-verse Field Manager can approve requests for vacation and time off based on workload demands); Cayer Decl. [64-1] at ¶ 6 (I&M Field Manager can grant technicians time off or change vacation days); Macolly Decl. [64-1] at ¶ 8 (U-verse Field Manager can approve certain overtime requests); Oeth Decl. [64-1] at ¶ 7 (C&E Field Manager can approve overtime); Cayer Decl. [64-1] at ¶ 16 (I&M Field Manager can informally discipline technicians using verbal counseling); Fancher Decl. [64-1] at ¶ 12 (U-verse Field Manager can initiate informal and formal discipline).) As these declarations reflect, though, these activities are not confined to any one business organization,

---

[5] Plaintiffs urge the Court to disregard BellSouth's declarations and supporting documents until the second stage of certification. The Court declines to do so. As discussed, because only limited discovery may have occurred at the notice stage, the Eleventh Circuit has stated that, "In some cases, the district court's first-stage certification analysis is properly based on plaintiffs' pleadings and affidavits." *Morgan*, 551 F.3d at 1262 n.41. However, the Eleventh Circuit has not expressly authorized a district court to disregard a defendant's evidence merely because the court is at the initial notice stage.

but are instead shared amongst Field Managers across the company.[6]

Furthermore, BellSouth's declarations corroborate plaintiffs' evidence that all Field Managers are expected to follow MSOC, which standardizes their basic job requirements. (Cayer Decl. [64-1] at ¶ 9 ("I see the MSOC system as intending to make uniform many of the things Managers across the company do each day, such as filling out the same documentation and doing the same activities each day."); Hall Decl. [64-1] at ¶ 24 ("Complying with MSOC is very time-consuming and has made my job more difficult. There are greater requirements for documenting performance evaluations, quality and safety inspections, and [Demonstrated Performance Capability] rides.").) No matter what business organization they belong to, every Field Manager must hold daily tailgate meetings, relay company information to technicians, conduct safety and quality inspections, monitor and document their technicians' performance, and ensure that assignments are completed. The fact that some Field Managers may sometimes perform additional duties (such as ordering supplies or granting time-off requests) does not defeat plaintiffs' argument

---

[6] Although the merits of the case are not at issue here, the Court notes that even if a Field Manager performs some discretionary duties, he may still be entitled to overtime wages under the FLSA so long as the employee's primary duty is non-exempt work. *See Morgan*, 551 F.3d at 1268 ("[A]n employee whose primary duty is to perform nonexempt work does not become exempt merely because she has some responsibility for occasionally directing the work of nonexempt employees.").

that they are similarly situated.  Employees need only have similar job positions, not identical ones.  *See Morgan*, 551 F.3d at 1260. Here, the MSOC has "leveled the playing field" by imposing the same standards on all Field Managers.  (Davis Decl. [64-1] at ¶ 27.)

BellSouth next points to a May 2010 telephone survey it commissioned of 662 current and former Field Managers, conducted by the Field Research Corporation which is headed by Dr. Deborah Jay. (BellSouth Field Managers Survey [64-3] at 4.)  The survey questioned Field Managers about whether they determine work assignments, approve overtime, order supplies, train technicians, discipline technicians, resolve customer complaints, and perform other duties.  (*Id.* at 5-7.)  BellSouth argues that the survey's results show that an overwhelming majority of Field Managers have different work experiences than those recounted by plaintiffs.  Like BellSouth's declarations, this survey appears to contradict certain facts plaintiffs seek to prove about their managerial capacity.  The Court is satisfied, however, that plaintiffs' substantial allegations and documentary evidence "successfully engage" BellSouth's evidence to the contrary.  *Grayson*, 79 F.3d at 1099 n. 17 (quotation marks and citation omitted) (considering employer's contradictory evidence but finding plaintiffs met the similarly situated requirement).

20

BellSouth further argues that plaintiffs' deposition testimony shows that they are not low-level clerks who uniformly lack authority or discretion.  Rather, BellSouth contends that Plaintiffs "regularly perform exempt managerial duties."  (Def.'s Mem. [80-1] at 29.)  However, closer inspection of the deposition testimony does not clearly support BellSouth's argument.

For example, BellSouth cites Philip Hoyle's deposition as evidence that some Field Managers have formally disciplined their technicians without involving their area manager or Human Resources. The cited incident involved a technician who was about to physically attack Hoyle after Hoyle said the technician had made a ticket error.  (Hoyle Dep. [64-11] at 306-307.)  When the approximately 300-pound technician came charging at Hoyle "like a bull," Hoyle immediately suspended him for the day in order to defuse the tense situation and prevent a physical altercation.  (*Id.* at 307:4-14.) As Hoyle explained, "There was no time to pick up the phone and say pretty please to HR and call C.J. and all that." (*Id.* at 307:11-13.) Immediately afterwards, however, Hoyle notified Human Resources and his area manager.  (*Id.* at 307:15-19.)  Elsewhere in his deposition, Hoyle testified that Field Managers are required to consult with Human Resources on every level of discipline, even at the first step of verbal counseling.  (*Id.* at 292: 4-7.)  Hoyle also stated that if a technician had recurring safety violations, he would notify his

21

area manager and Human Resources of the violations and "let them make a decision" on whether to impose discipline. (*Id.* at 283: 13-17.) The referenced incident thus appears to be an aberration from the company's discipline policies that Hoyle typically followed.

Another example BellSouth lists as a management duty regularly performed by Field Managers is to prepare Individual Development Plans for their technicians based on a discussion with each technician about her/his career goals. *See* Tripodi Dep. [64-15], 129:2-132:2, Exh. 8. What Joseph Tripodi actually said about these plans is this:

> Everybody had to have one. The company said that we had to fill one out for everybody. It's basically an interview. Where would you like to be at this time? And it's just an interview of where would the technician like to be 30 years from now. Retired. Hey, good. Good answer. That type of thing.

(Tripodi Dep. [64-15] at 129:10-16.) Tripodi merely asked questions from an interview form and then "sent it up the ladder." (*Id.* at 130:22 - 131:1-3.) In Tripodi's opinion, these plans were "just more paperwork to do for no really apparent reason." (*Id.* at 129:6-7.) BellSouth fails to explain how this testimony qualifies as exempt managerial work. *See* 29 C.F.R. § 541.102 (2010) (defining the term "management" for purposes of executive exemption).

Finally, BellSouth argues that collective treatment is inappropriate because the Court would have to undertake a highly individualized, fact-intensive inquiry to determine whether each employee is exempt under the FLSA. The Eleventh Circuit has repeatedly rejected this argument: "Just because the inquiry is fact-intensive does not preclude a collective action where plaintiffs share common job traits." *Morgan*, 551 F.3d at 1263. Likewise, in *Hipp*, the Eleventh Circuit dismissed an insurance company's argument that an age discrimination lawsuit was ill-suited for a collective action:

> Liberty National also argues that each plaintiff's case was unique and required an individual analysis of his or her working conditions. Like the plaintiffs in *Grayson*, however, Plaintiffs in this case all held the same job title, and they all alleged similar, though not identical, discriminatory treatment.

*Hipp*, 252 F.3d at 1219. As in these cases, the plaintiffs are all considered Level One or First Level Managers,[7] they share similar job duties and daily routines, and they all allege the same unlawful treatment--namely, that BellSouth denied them overtime pay to which they were entitled. In any event, it is too early for the Court to

---

[7] BellSouth's evidence indicates that Field Managers or Level One Managers in the I&M and the U-verse organizations are titled "Manager Network Services," whereas they hold the title of "Manager Construction & Engineering" in the C&E group. (Anderson Decl. [64-6] at ¶¶ 4-6.) Regardless of their title, BellSouth admits that all Field Managers are classified as exempt from overtime pay. (Def's Mem. at 5 n.4.)

determine whether or not a collective action in this case will be procedurally cumbersome.  Such a concern is better suited at the second stage of certification, after notice has been sent and the Court has a better idea of how many individuals will comprise the class.  *See Morgan*, 551 F.3d at 1261 (noting that issues of procedural considerations are factored into the court's decision at the second stage).

The Court concludes that plaintiffs' substantial allegations and evidentiary support provide a reasonable basis for their claim that there are other similarly situated employees who were unlawfully denied overtime wages.  *See Morgan*, 551 F.3d at 1259; *Grayson*, 79 F.3d at 1097.  The Court's conclusion is in accord with two other district courts which have certified collective actions of AT&T Field Managers alleging identical FLSA overtime pay violations. *See Luque v. AT&T Corp.*, 2010 WL 4807088, at *1 (N.D. Cal. Nov. 19, 2010) (granting motion for conditional collective action certification); *Perkins v. S. New England Tel. Co.*, 669 F. Supp. 2d 212, 218-222 (D. Conn. 2009) (certifying FLSA collective action based on more stringent second stage factors, as well as granting Class 23(b)(3) certification).  Although these cases are from district courts in other circuits and are not controlling, the Court finds their analysis and reasoning persuasive.  As plaintiffs have

24

satisfied their burden at this initial stage, they are entitled to conditional certification of a collective action under the FLSA.

**III.  Notice**

In conjunction with the decision to certify a conditional collective action, the Court authorizes the issuance of notice to the putative class members.  *See Morgan*, 551 F.3d at 1261 n.40 ("District courts following the two-step *Hipp* approach should treat the initial decision to certify and the decision to notify potential collective action members as synonymous.").  Plaintiffs have submitted a proposed Notice of Court Certification of Collective Action.  (Heisler Decl., Exh. B [27-4].)  BellSouth objects to this notice on various grounds.  (Def's Mem. [80-1] at 38-40.)  The Court agrees with several of BellSouth's objections and therefore amends the proposed notice as follows.

**A.   Definition Of The Class**

First, BellSouth contends that the class is not adequately defined.  The proposed notice is addressed to the following class:

**ALL FIELD MANAGERS (LEVEL ONE MANAGERS WITH FIELD TECHNICIANS) EMPLOYED BY BELLSOUTH AT ANY TIME BETWEEN DECEMBER 2006 AND THE PRESENT.**

(Heisler Decl., Exh. B [27-4] at 1.)  Because "Field Manager" and "Field Technician" are not official BellSouth job titles, BellSouth argues that putative class members will be unable to determine if they can opt into the lawsuit.

25

The Court disagrees.  It is undisputed that Field Managers are actually Level One Managers who supervise field technicians.  The plaintiffs' declarations uniformly state that Level One Managers are also known as Field Managers because they work with technicians in the field.  (*See, e.g.*, Lawson Decl. [27-5] at ¶ 3; Phillips Decl. [27-8] at ¶ 3; Coffman Decl. [27-12] at ¶ 3; Borchetta Decl. [27-15] at ¶ 3.)  Moreover, despite lack of official notice, more than three dozen Level One Managers have joined the action since it was filed. BellSouth also submitted its own declarations from twenty-five Level One Managers, and retained a research firm to contact 662 Field Managers in a telephone survey for purposes of this lawsuit.  These numbers indicate that putative class members (as well as BellSouth) are sufficiently aware of what the term "Field Manager" encompasses.

Accordingly, plaintiffs' definition of their class, as proposed, will be permitted.

**B.  Inclusion Of A Signature Line For The Court**

The Court does agree, however, with BellSouth's objection to the placement of a signature line for the Court on the notice.  The undersigned's signature on the notice could be perceived as an implicit judicial endorsement of the action's merits.  *See Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 174 (1989) (cautioning that trial courts "must be scrupulous to respect judicial neutrality" and "avoid even the appearance of judicial endorsement of the merits of

26

the action" when sending notice of a collective action); *Luque*, 2010 WL 4807088, at *7 (removing court's signature line from proposed notice).   The signature line should therefore be deleted from the notice.

> C.   **Statement That The Court Has Authorized The Notice**

Next, BellSouth objects to the following paragraph inserted at the end of the notice:

> **THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE FEDERAL DISTRICT COURT, THE HONORABLE JUDGE JULIE E. CARNES.   THE COURT HAS NOT YET EXPRESSED ANY OPINION ABOUT THE MERITS OF THE CLAIMS ASSERTED OR THE DEFENSES RAISED, AND YOU SHOULD NOT INTERPRET THE SENDING OF THIS NOTICE AS ANY INDICATION OF THE COURT'S OPINION OF THE ULTIMATE OUTCOME OF THE CASE.   PLEASE DO NOT CONTACT THE COURT OR THE COURT CLERK WITH QUESTIONS ABOUT THIS LAWSUIT OR NOTICE.**

(Heisler Decl., Exh. B [27-4] at 2.)   BellSouth contends that the statement that the notice "has been authorized by the federal district court" could be construed as a judicial endorsement of plaintiffs' case.   This sentence clearly pertains only to the notice itself, however, and is immediately followed by the disclaimers that the Court "has not yet expressed any opinion about the merits of the claims asserted," and that sending of the notice does not indicate the Court's opinion about the case's outcome.   Read as a whole, the paragraph does not imply that the Court believes plaintiffs' claims are meritorious.

AO 72A
(Rev.8/82)

The Court agrees with BellSouth, however, that this paragraph should be moved to the first page of the notice. The Court instructs plaintiffs to amend the notice so that this paragraph is directly under the caption "*William Lawson, et al. v. BellSouth Telecommunications, Inc.*, U.S. District Court for the Northern District of Georgia."

Further, the Court sees no need for the undersigned's name to appear on the notice, as long as the putative class members are aware that the notice has been authorized by a federal judge. Accordingly, in addition to moving this paragraph, as explained above, the plaintiffs shall modify the paragraph, with strike-outs showing language to delete and underlining showing language to add, to read as follows:

> **THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY ~~THE~~ A FEDERAL DISTRICT COURT <u>IN THE NORTHERN DISTRICT OF GEORGIA</u>, ~~THE HONORABLE JUDGE JULIE E. CARNES~~. THE COURT HAS NOT YET EXPRESSED ANY OPINION ABOUT THE MERITS OF THE CLAIMS ASSERTED OR THE DEFENSES RAISED, AND YOU SHOULD NOT INTERPRET THE SENDING OF THIS NOTICE AS ANY INDICATION OF THE COURT'S OPINION OF THE ULTIMATE OUTCOME OF THE CASE. PLEASE DO NOT CONTACT THE COURT OR THE COURT CLERK WITH QUESTIONS ABOUT THIS LAWSUIT OR NOTICE.**

> **D.   <u>Notice's Omission Of Obligations Of Class Members</u>**

Fourth, BellSouth argues that the proposed notice fails to advise putative class members that they might be deposed or have to testify in court, should they opt in. It is important for putative

28

class members to understand that certain time commitments and activities may be required if they join the lawsuit.  The district courts in both *Luque* and *Perkins* sent out notices which included a sentence informing putative class members about this possibility. *See Luque*, 2010 WL 4807088, at *7 (including statement in notice that class members "might be required to provide information") (quotation marks omitted); Wittels Decl., Exh. U [87-22] at 4.  The Court adopts the language used in the *Perkins* notice and instructs plaintiffs to add the following sentence to the end of the first paragraph in section III, titled "Effect of Joining this Lawsuit":

> While this suit is pending, you may be required to participate in it by, among other things, responding to written questions, sitting for depositions, and/or testifying in court.

Last, BellSouth correctly points out that the notice does not specify a time limit for potential class members to opt in. BellSouth's suggested 30-day response period is too brief.  Both *Luque* and *Perkins* imposed a 60-day deadline from the date of mailing, and the Court finds this to be reasonable.  *See Luque*, 2010 WL 4807088, at *7; Wittels Decl., Exh. U [87-22] at 5.  The proposed notice already contains the following paragraph under section II:

> **TO JOIN THE LAWSUIT, YOU <u>MUST</u> SIGN, DATE AND MAIL THE "CONSENT TO JOIN" FORM TO PLAINTIFFS' COUNSEL.  IF THE FORM IS NOT TURNED IN, YOU <u>WILL NOT</u> BE A PART OF THIS LAWSUIT.**

29

(Heisler Decl., Exh. B [27-4] at 2).  Plaintiffs are instructed to add the following sentence to the end of that paragraph:

> **YOUR "CONSENT TO JOIN" FORM MUST BE POSTMARKED NO LATER THAN [date 60 days from mail date] IN ORDER FOR YOU TO BE INCLUDED IN THE LAWSUIT.**

### CONCLUSION

Plaintiffs have met their lenient burden at the notice stage to show that they are similarly situated to other employees. Accordingly, the Court **GRANTS** plaintiffs' Motion for Conditional Collective Action Certification and Issuance of Notice to the Collective Action Class [27], subject to the amendments the Court has made to the proposed notice.  The Court also **ORDERS** BellSouth to provide plaintiffs the names and contact information of class members, within twenty-one (21) days of this Order.

SO ORDERED, this <u>16th</u> day of August, 2011.


<u>/s/ Julie E. Carnes</u>
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE