# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| WILLIAM LAWSON, JOE TRIPODI, THOMAS WHITTINGTON, JASON PHILLIPS, AND NESBIT B. ("BRAD") SILLS, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action File No. |
| v. | ) ) | 1:09-cv-3528-JEC |
| BELLSOUTH TELECOMMUNICATIONS, INC., d/b/a AT&T SOUTHEAST a.k.a. AT&T ALABAMA/AT&T FLORIDA/AT&T GEORGIA/ AT&T KENTUCKY/AT&T LOUISIANA/AT&T MISSISSIPPI/AT&T NORTH CAROLINA, AT&T SOUTH CAROLINA/AT&T TENNESSEE, | ) ) ) ) ) ) ) ) | |
| *Defendant*. | ) ) | |

## JOINT DECLARATION OF DAVID SANFORD AND JEREMY HEISLER IN SUPPORT OF THE PARTIES' JOINT MOTION FOR SETTLEMENT APPROVAL AND PLAINTIFFS' UNOPPOSED APPLICATION FOR ATTORNEY'S FEES AND SERVICE PAYMENTS

David Sanford and Jeremy Heisler state as follows under the penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.     David Sanford and Jeremy Heisler are founding partners in the Washington, DC and New York City offices of Sanford Heisler, LLP respectively. Messrs. Sanford and Heisler are Lead Counsel for Plaintiffs and the collective action class.  Based on their active participation and supervision in all material

aspects of the prosecution and settlement of this action, they have personal knowledge of the matters set forth in this declaration, unless stated otherwise.

2.      Messrs. Sanford and Heisler make this Declaration in support of the parties' joint motion for settlement approval and plaintiffs' unopposed application for attorney's fees and service payments.

## I.      <u>Lead Counsel's Background</u>

3.      David Sanford graduated from Stanford Law School in 1995.  He was a law clerk for Judge Gladys Kessler of the United States District Court for the District of Columbia from 1995 through 1996.  Mr. Sanford has been a member in good standing of the Maryland State Bar and the District of Columbia Bar since 1997 and is admitted to this Court on a *pro hac vice* basis in this case.  Since 2001, Mr. Sanford has been lead or co-lead Class Counsel in more than 50 Title VII and wage and hour matters throughout the United States, has obtained approximately 36 class settlements , and is currently serving as Lead Counsel in numerous class, individual and qui tam matters. He is an "AV" rated attorney.

4.      Jeremy Heisler graduated *magna cum laude* from Brooklyn Law School in 1979 where he was an editor of the Law Review.  Mr. Heisler was an Appellate Law Assistant for the Appellate Term, First Department during 1980-1981.  Mr. Heisler has been a member in good standing of the New York State bar since January 1980 and the bar of the Southern and Eastern Districts of New York

since March 1980.  He has been admitted to this Court on a *pro hac vice* basis in this case.

5.     The law firm of Sanford Heisler, LLP ("Class Counsel") has been and continues to be significantly involved in civil rights and employment class action litigation.  The firm is "AV" rated.  Sanford Heisler has served as counsel in numerous class actions around the United States, generating hundreds of millions of dollars in recoveries to class members.

## II.   Introduction to the Proposed Settlement and Relief Sought by the Motions

6.     The parties' joint motion seeks approval of the Settlement of this wage and hour collective action – a settlement that has come after almost three years of litigation, extensive discovery, and two separate mediations before nationally-renowned mediator David Rotman.  In the three Field Manager overtime misclassification cases against BellSouth and its corporate affiliates, the parties have taken approximately 120 depositions, reviewed and exchanged millions of pages of documents and data, and conducted detailed expert analyses on class and collective action certification, liability, and damages.

7.     On April 19, 2012, after a fourteen-hour day of mediation, the parties signed a Settlement Term Sheet that encompassed all claims asserted in this action and the two other Field Manager overtime lawsuits filed against Defendant's

corporate affiliates.[1]   The parties then spent months negotiating and drafting the comprehensive Joint Stipulation of Class Settlement in the *Luque* case.   The Parties' Settlement Term sheet required that the Rule 23 class action settlement in *Luque* receive preliminary approval before the collective action settlement in this case was submitted to the Court for approval.   On November 19, 2012, Judge Charles R. Breyer of the Northern District of California preliminarily approved the settlement in *Luque.*   The parties now submit the settlement in this case for approval by the Court.

8.     The proposed settlement sum provides a monetary benefit to the class of up to $8,129,675.   This amount includes the requested $2,510,838.80 in attorneys' fees and costs to Plaintiffs' counsel and $62,500 in service payments to the Named Plaintiffs and other class members. The class members are assigned a *pro* rata share of the remaining settlement funds calculated based upon the number of weeks they worked in a class position during the applicable statute of limitations.   In order to receive their settlement share, class members are required to complete a Consent and Claim Form that includes a release, a Field Manager position job duties document for current Field Managers, and an agreement to

---

[1] The other two suits are *Luque v. AT&T Corp.*, No. 3:09-cv-5885 (N.D. Cal.) and *Perkins v. S. New Eng. Tel. Co*, No. 3:07-cv-956 (D. Conn)

arbitrate future claims.[2]  Many of the collective action Plaintiffs in this case are already subject to the company's Management Arbitration Agreement or no longer work for the company.

9.      In arriving at this favorable result, Plaintiffs and Class Counsel recognized the expense and length of a trial and potential appellate process, and further acknowledged that success opposing a likely motion to decertify the collective action and success on the merits remain highly uncertain.  The high degree of risk in further litigation is underscored by an October 2011 jury verdict in favor of a corporate affiliate of the Defendant in *Perkins v. S. New Eng. Tel. Co.*, No. 3:07-cv-967(JCH), Dkt. Nos. 569, Verdict; 572, Judgment (D. Conn.) – the first of the three Field Manager cases to proceed to trial, and a precursor to this action.

10.     Pursuant to the terms of the Settlement, the parties now respectfully move the Court for:

> (i)     Approval of the parties' Settlement Agreement; and
>
> (ii)    Approval of the parties' Notice of Settlement and Consent and Claim Forms for mailing to the class members;

Plaintiffs also respectfully move, unopposed, for:

> (i)     Attorney's fees and costs to Class Counsel in the amount of

---

[2] A true copy of the Joint Stipulation of Class Settlement Agreement along with its exhibits (the "Settlement" or the "Agreement") is annexed hereto as Exhibit A.

$2,510,838.80; and

(ii)    Service payments to the five Named Plaintiffs and to five opt-in Plaintiffs who had their depositions taken by Defendant.

11. In the paragraphs that follow, we will describe the factual background and procedural history of this lawsuit and summarize the terms of the proposed Settlement. Accompanying this Declaration is the Memorandums of Law in Support of the Parties' Joint Motion for Settlement Approval and Plaintiffs' Unopposed Motion for Attorney's Fees and Service Payments that demonstrates why, under governing decisional law, this Court should approve the proposed Settlement and grant the relief requested in the instant motions.

## III.    <u>Plaintiffs' Suit And The Litigation History</u>

### A.    Pre-Litigation History and Investigation

12.    On June 21, 2007, Class Counsel filed a class and collective action overtime complaint in federal court on behalf of Field Managers in Connecticut captioned *Perkins v. Southern New England Telephone Company,* 3:07-CV-967(JCH) (D. Conn.). The parties thereafter engaged in extensive discovery in the *Perkins* case, which consisted of approximately 60 depositions, the exchange of hundreds of thousands of pages of data and documents, and numerous interrogatories propounded by both sides.  In November 2009, on an extensive record, the *Perkins* court certified the case as a collective action under 29 U.S.C. §

216(b) and class action under Fed. R. Civ. P. 23(b)(3).  *See Perkins v. S. New Eng.*

*Tel. Co.*, 669 F. Supp.2d 212 (D. Conn. 2009).

13.    During the discovery process in *Perkins*, Field Managers across the country contacted Class Counsel seeking to participate in the suit or bring their own separate actions.  In response to their requests, Class Counsel initiated a comprehensive investigation of the terms and conditions of employment of the Field Managers in BellSouth's nine-state region and across the country.

**B.    The Complaint and Response From Additional Field Managers**

14.    On December 16, 2009, after Class Counsel completed its investigation, Plaintiffs filed the collective action complaint in this case alleging violations of federal wage and hour laws caused by Defendant's classification of the Field Managers as exempt. (Doc. 1)  Plaintiffs brought the case on behalf of themselves and all Field Managers employed by BellSouth during the applicable limitations period.

15.    Shortly after filing the Complaint, many additional current and former BellSouth Field Managers contacted Class Counsel, requesting information about the case and inquiring whether they were eligible to participate.  Class Counsel conducted lengthy intakes with the Field Managers to verify that their experiences were similar to those of the Plaintiffs and that their work histories made them eligible to participate in a FLSA collective action.  Through this process, twenty

four additional current and former Field Managers opted-in to the FLSA collective action in advance of Plaintiffs moving for conditional certification. (Docs. 3-6, 8, 24, 26).  Approximately thirty one additional Field Managers opted in prior to the issuance of collective action notice to the proposed class.  (Docs. 47, 60, 78, 79, 81, 101-107)

### C.    Conditional Certification Briefing

16.    On May 14, 2010, Plaintiffs moved for conditional certification of a collective action under § 216(b) of the FLSA. (Doc. 27)  In support of their motion for conditional certification, Plaintiffs submitted detailed declarations from sixteen current and former Field Managers. (*Id.*)

17.    The next day, on May 15, 2010, Plaintiffs filed a motion for leave to file a first amended complaint, which added an additional named plaintiff and amended the FLSA class definition.  (Doc. 28)

18.    One week later, on May 21, 2010, Defendant moved the Court to compel written discovery responses and depositions of the Named Plaintiffs and opt-in Plaintiffs and to delay the deadline for their response to Plaintiffs' motion for conditional certification until after the discovery had been completed.   (Doc. 29)

19.    The parties then engaged in a meet and confer process, and ultimately reached agreements regarding the scope of conditional certification fact discovery

and the briefing schedule for Defendant's opposition to Plaintiffs' motion for conditional certification and Plaintiffs' reply in support of their motion. (Docs. 32-35).

20.     On February 4, 2011, Defendants filed their opposition to Plaintiffs' motion for collective action certification and declarations in support of their opposition. (Docs. 64 - 76). The declarations included a declaration and report from Dr. Deborah Jay presenting the methodology and results of a survey she conducted regarding the job duties and work routines of BellSouth Field Managers. (Doc. 64).

21.     On April 6, 2011, Plaintiffs filed their reply memorandum in support of their motion for conditional certification along with supporting documents such as declarations from fifteen Field Managers and various deposition excerpts, including from three 30(b)(6) corporate witnesses[3]. (Doc. 87).

22.     On August 16, 2011 the Court granted conditional certification and approved the issuance of a Notice Form to the collective action class. (Doc. 98).

23.     After receiving the Notice Form, well over six hundred additional current and former Field Managers opted-in to the FLSA collective action. (Docs. 108-116).

---

[3] Class counsel took the 30(b)(6) depositions in the context of the *Perkins* litigation and were in the process of an ongoing meet and confer discussion regarding the extent to which the depositions would serve as Defendant's and its corporate affiliates' 30(b)(6) testimony in the *Lawson* and *Luque* cases.

### D.  Discovery During the Conditional Certification Process

24.     During the conditional certification discovery period, the parties engaged in extensive discovery, including the exchange of multiple rounds of written discovery and the depositions of ten named and opt-in Plaintiffs.  Plaintiffs' 30(b)(6) depositions of three corporate witnesses in the *Perkins* case were also highly material to this action and to the motion for conditional certification.

### E.     The Parties' Unsuccessful Attempts to Resolve the Case

25.     On Sunday, September 18, 2011, less than two weeks before the pending trial in the Connecticut *Perkins* case and with another wave of extensive discovery on the horizon in this case and extensive class certification discovery occurring in the *Luque* case, the parties engaged in mediation before experienced mediator David Rotman.  To assist in the mediation, Plaintiffs engaged Dr. Richard Drogin to perform damages projections in this case, the *Perkins* case, and the *Luque* case.  Despite a full-day of mediation, the parties were unable to settle this case or either of the other two Field Manager cases.

26.     Just before the start of the *Perkins* trial, on September 27, 2011 the parties proceeded to a court-ordered settlement conference before Magistrate Judge William Garfinkel of the District of Connecticut.  The settlement conference was also unsuccessful in resolving either the *Perkins* action individually or the three cases together.

### F.      The Field Managers Lose at Trial in the Similar *Perkins* Action

27.      In October 2011, the *Perkins* case was tried before a jury in the District of Connecticut.  The jury returned a verdict for defendant Southern New England Telephone Company (SNET) finding that the Field Managers were exempt from overtime pay under the FLSA and Connecticut executive exemptions. In December 2011, the District Court denied the *Perkins* Plaintiffs' motion to set aside the verdict, or for a new trial.  Plaintiffs appealed to the Second Circuit.

### G.      The Second Mediation and Resulting Settlement

28.      On April 19, 2012, with post-conditional certification discovery beginning in earnest in this case, the deadline for the plaintiffs' Rule 23 class certification motion rapidly approaching in the *Luque* case, and the *Perkins* Second Circuit appeal pending, the parties engaged in a second, full-day mediation before mediator Rotman. After more than fourteen hours of intense arm's-length negotiations facilitated by Mr. Rotman, the parties reached an agreement in principle to settle all three cases and signed a term sheet.

### H.      Post-Mediation Developments – Judge Breyer Preliminarily Approves the California Portion of the Settlement

29.      Since the second mediation, the parties have spent substantial additional time ironing out the details of the settlement and analyzing the employment history data of the class members and opt-in plaintiffs eligible to receive an award of settlement benefits in the three cases.   The parties also

submitted the *Luque* Rule 23 class action settlement for preliminary approval by the Northern District of California.  On November 19, 2012, Judge Charles R. Breyer of the Northern District of California preliminarily approved the settlement. A hearing on final approval is scheduled for April 26, 2013.

## IV.    Terms of the Settlement Agreement

30.    Defendants will pay up to $8,129,675 to settle this lawsuit.  This amount was derived by apportioning the $27,050,000 in settlement funds allocated to the *Lawson* and *Luque*  cases based on the number of workweeks eligible to be compensated in the respective lawsuits.  (Settlement, ¶¶ 12, 29).

31.    The class members in this case (as in the *Luque* class action) are assigned a *pro* rata share of the settlement calculated based upon the number of weeks they worked in a class position during the applicable statutes of limitations. In order to receive their settlement share, class members are required to complete a Consent and Claim Form that includes a release, a Field Manager position job duties document for current Field Managers, and an agreement to arbitrate future claims.  The Settlement Agreement, Notice, and Consent and Claim Forms provide notification to class members that nothing in the settlement serves as a waiver of future rights.  Moreover, the class employment history data and other information provided by Defendant confirms that many of the class members are already subject to the company's Management Arbitration Agreement, which was

12

distributed to its employees in 2011, or no longer work for the company.

32.    Out of the settlement funds, Plaintiffs may apply for service payments to the named Plaintiffs and other class members who assisted in the litigation in an amount not to exceed $10,000 each. (Settlement Agreement, ¶ 31).  As part of this Settlement, Plaintiffs seek $62,500 to be allocated between the five named Plaintiffs, and the other five opt-in Plaintiffs that had their depositions taken by Defendant.  All of these individuals substantially contributed to the success of the case.  The aggregate service payments represent less than one percent of the total monetary relief to the class.

33.    For settlement purposes only, Defendant has agreed that Class Members are "similarly situated" under section 216(b) of the Fair Labor Standards Act. (Settlement Agreement, ¶ 28)

34.    For the reasons explained in the accompanying Memorandum of Law, the parties' proposed settlement falls clearly within the range of possible approval and is favorable to the Class; it thus warrants approval and an opportunity for the class members to receive notice of the settlement.

## V.    The Class Members' Extraordinarily Favorable Response to the Substantially-Similar *Luque* Settlement

35.    The settlement preliminarily approved in the *Luque* case is substantially similar to the settlement in this case.  All of the relevant terms are the same, and participating class members will receive the same per-week amount.

Therefore, the reaction of the *Luque* class to the Rule 23(e) notice in that case is a good barometer of the fairness and reasonableness of this settlement – one that the Court is often not privy to in an FLSA collective action such as this.

36.    The response of the *Luque* Field Manager class is resounding in support of the settlement terms: 1,196 Field Managers have submitted Claim Forms in order to participate in the settlement (84% of the class), while only six have opted-out of the settlement class and zero have objected to the settlement.

**VII.    The Settlement is Fair and Reasonable and Should Be Approved**

37.    Accompanying this Joint Declaration is a Memorandum of Law in Support of the parties' joint motion that demonstrates why, under governing law, this Court should approve the proposed Settlement and grant the relief requested in the instant motion.

38.    Based on company data regarding the class, we are able to estimate the weekly settlement payment at $57.27 and the average settlement award at over $8,000.  A Plaintiff who worked in a class position for the entire class period would receive an award of approximately $14,500.

39.    These settlement amounts are significantly higher than typical FLSA wage and hour payouts, where per-plaintiff settlement amounts are usually between $2,700 and $5,600.  NERA Economic Consulting "Trends in Wage and Hour Settlements: 2011 Update," at 6 (Mar. 22, 2012).  Courts have often

approved settlements with individual benefits of hundreds of dollars or less.

40. Based on the employment data provided and expert analysis conducted in *Perkins* and *Luque*, Plaintiffs estimate that the settlement represents roughly one-third of their reasonable maximum recovery.  This estimate assumes that Plaintiffs would win the fluctuating workweek issue and would receive liquidated (double) damages.  These assumptions are by no means certain given the state of the law – including five Circuit courts endorsing the use of the FWW in misclassification cases – and the result in the *Perkins* trial.

41. With the various factual and legal disputes in the case, Plaintiffs believe that the settlement represents anywhere from approximately 10% to well over 200% of the range of the theoretically possible damages verdicts should they prevail on liability.  An outcome on the low end of this range (approximately 10% recovery) assumes that Plaintiffs would achieve extraordinary, unparalleled success on every single liability and damages issue and is extremely remote.

42.    Assuming that the Plaintiffs lose the FWW issue and liquidated damages, we are able to estimate their recovery through settlement at more than double the likely damages at trial.  In *Luque*, Defendants' damages expert calculated the California FLSA class' damages at $7,558,948 assuming 12 hours of unpaid overtime per employee per week and all other damages issues resolved in favor of the company.  The *Luque* settlement of $18,920,325 is approximately 2.5 times

15

this figure.   Since the *Lawson* and *Luque* settlements are based on the same calculations – dividing the overall settlement pool based on the number of eligible workweeks to be compensated in each case – it is reasonable to assume that similar figures would apply here.

43.   As discussed above, the *Luque* class has responded with an overwhelming endorsement of the settlement.  We believe that it is fair to assume that this identical settlement will be met with a similar reaction.  Any Plaintiff who does not affirmatively sign onto the settlement by submitting a Claim Form will be effectively exercising the right to opt-out and will not have his or her rights affected in any manner.  Unlike a Rule 23 settlement, such as *Luque*, there will be no absent class members affected by the settlement.

44.   These are only some of the factors supporting the fairness and reasonableness of the settlement, as more fully discussed in the accompanying Memorandum of Law.

**VIII.  THE SERVICE PAYMENT REQUESTS ARE REASONABLE**

45.   Plaintiffs also request, unopposed, that service payments be awarded to the five Named Plaintiffs and to the 5 additional deponent-Plaintiffs, in the amount of $10,000 for the five Named Plaintiffs and $2,500 for each of the 5 other deponents.  The amounts sought are minimal: a total of $62,500 – less than one percent of the Settlement Fund.

46.     Such service payments are strongly supported by public policy and typically have been endorsed by courts as compensation for individual's services to the Class.   (*See* Memorandum of Law, pgs. 21-24). Without the efforts and sacrifices of the Named Plaintiffs and Deponents, this case may never have been brought or have achieved the successful result accomplished by the settlement.

47.     The Named Plaintiffs and deponents have all: (1) risked economic harm, and (2) contributed significantly to prosecuting this action.   This is particularly true given the high-profile, landmark nature of this lawsuit.  Each of the Named Plaintiffs and Deponents lent their names to the prosecution of this suit and was instrumental in achieving this settlement.   Additionally, the Named Plaintiffs and Deponents travelled to participate in full-day depositions after extensive preparation.

48.     Defendant BellSouth has agreed to the requested service payments.  In *Luque*, the court-approved Notice informed members of the Class about equivalent service payments in that case.   Armed with that knowledge, no *Luque* class members have filed any objections to the proposed service awards.

## IX.   PLAINTIFFS' ATTORNEYS FEES AND EXPENSES ARE REASONABLE

49.     Class Counsel prosecuted this case on a contingent fee basis, without any assurance whatsoever that they would ever be paid or compensated for the expenses they had to advance to secure the victory.

50.     The Settlement Agreement provides for up to 33.33% in combined attorney's fees and litigation expenses.  Plaintiffs' counsel now seeks $71,936.80 in litigation expenses, or 0.88% of the total settlement, and $2,438,902 in attorney's fees, or 30% of the total settlement.  The requested fee is consistent with or below percentage awards given in this Circuit and elsewhere in complex collective and class action settlements, including in comparable wage and hour cases.

51.     The *Luque* class settlement also included a provision for attorney's fees and litigation expenses in a combined amount of up to 33.33%.  Although more than 1,400 class members were sent notice of the *Luque* settlement, and 1,196 members submitted Claim Forms, not a single class member has objected to any term of the settlement – including the fee provision.  Not a single employee-class member to whom Class Counsel has spoken in both this case and *Luque* raised any questions or voiced any concern about the fee award.

52.     Over the past three years (plus an additional two-and-a-half years in *Perkins*), Plaintiffs developed an extensive record; drafted and filed voluminous briefing; and engaged in lengthy settlement negotiations and settlement drafting.  In furtherance of these efforts, Class Counsel  and Co-Counsel have dedicated more than 3,000 hours prosecuting this litigation from its inception to date.  Since 2009, over 30 attorneys and staff members have worked on this matter.  Overall,

the prosecution of this action required a high level of experience and expertise in complex class and collective action litigation, as well as the ability to provide the highest caliber of legal services under challenging circumstances.

53.     Class Counsel expended many thousands of additional hours in the *Perkins* case, which will go uncompensated.   Class Counsel's massive efforts in *Perkins* – including approximately 60 depositions, extensive briefing on various issues, and a one-month trial – helped bring about the *Lawson* settlement.

54.     In addition, the fee for Class Counsel agreed upon in the Settlement Agreement will also serve as the sole compensation for the extensive future services to be performed by Class Counsel in service to Class Members, which includes overseeing all aspects of the Settlement Agreement, ongoing communications with class members and BellSouth, and coordination with the Claims Administrator.   Class Counsel expects to devote substantial additional hours overseeing the Settlement in the future.   In Class Counsel's experience, this could amount to hundreds of additional hours.

55.     Plaintiffs' attorneys have thus far incurred over $71,936.80 in costs and expenses.   Counsel anticipates spending significant additional dollars going forward, both in enforcing the terms of the settlement agreement and in maintaining and fulfilling their duties to the Class Members through regular communication and general availability.

56.     Although a "lodestar cross-check" has been deemed inappropriate within this Circuit, Class Counsel's "lodestar" to date – time expended, multiplied by hourly rates – is $1,376,709.71.  Plaintiffs request a multiplier enhancement of 1.77, significantly below the multipliers typically approved in similar cases both in the Eleventh Circuit and across the country.   As noted herein, Class Counsel anticipates spending additional time after this Court approves this Settlement. Thus, a 1.77 multiplier, which does not include the extensive labor performed in *Perkins*, would be significantly reduced over time.

57.     Current hourly rates for the attorneys who were instrumental in the litigation are as follows:

- Partners: $870.00 for David Sanford, and Jeremy Heisler; and $770.00 for Janette Wipper.

- Co-Counsel: $475 for Edward Buckley and Daniel Klein; $375 for Steven E. Wolfe; and $300 for Karyl Davis.

- Senior Litigation Counsel: $630 for Kyle Chadwick; $580 for Andrew Melzer and Kathy Leong; $525 for Chaya Mandelbaum and Matthew Schmid; and $475 for Felicia Medina and  Deborah Marcuse.

- Associates and Legal Fellows:; $525 for Tico Almeida; $450 for Lubna Alam; and $315 for Steven A. Starr.

These  individual  rates  are  based  on  the  attorney's  law  school  graduation year,  title  and  position,  and  legal  experience  as  well  as  the  prevailing  market  rates in  the  jurisdiction  in  which  the  attorney  practices.   Counsel's  research  indicates

that the rates of Sanford Heisler attorneys are below the market rates for comparable practitioners in the same jurisdictions.

58.    Current rates for staff are $195 for junior legal assistants and $205 for senior legal assistants at Sanford Heisler and $150 for Co-Counsel's paralegals.

We declare under penalty of perjury that the foregoing is true and correct.


Dated:         April 5, 2013

<div style="margin-left:40%">

By:    s/ David W. Sanford
David W. Sanford, D.C. Bar No. 457933
1666 Connecticut Ave. NW, Suite 300
Washington, D.C. 20009
Telephone: (202) 742-7780
Facsimile:  (202) 742-7776

By:    s/ Jeremy Heisler
Jeremy Heisler, NY Bar No. 1653484
SANFORD WITTELS & HEISLER, LLP
1350 Ave. of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 403-5651

*Counsel for Plaintiffs and the Class*

</div>